214 F.3d 1073 (9th Cir. 2000)
 NATIONAL WARRANTY INSURANCE COMPANY RRG, a Risk Retention Group, Plaintiff-Appellee,
v.
MIKE GREENFIELD, Director, Department of Consumer and Business Services of the State of Oregon, Defendant-Appellant.
 No. 98-36054
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted September 16, 1999--Portland, Oregon
Filed June 5, 2000
 
 Denise Fjordbeck, Assistant Attorney General, Salem, Oregon, for the defendant-appellant.
 M. Hannah Leavitt, Buchanan Ingersoll, Professional Corporation, Harrisburg, Pennsylvania, for the plaintiff-appellee.
 Appeal from the United States District Court for the District of Oregon Janice M. Stewart, Magistrate Judge, Presiding. D.C. No.CV-97-01654-JMS
 Andrew J. Kleinfeld and William A. Fletcher, Circuit Judges, and Nora Manella, District Judge[1]
 Opinion by Judge William A. Fletcher
 OPINION
 W. FLETCHER, Circuit Judge:
 
 
 1
 This case concerns the scope of federal preemption of state laws regulating a type of liability insurer known as a risk retention group ("RRG"). The federal government has preempted most state regulation of RRGs under the Product Liability Risk Retention Act of 1981 ("PLRRA"), as amended by the Liability Risk Retention Act of 1986 ("LRRA"). 15 U.S.C. SS 3901-3906. Under the Oregon Service Contract Act, the state of Oregon prohibits all RRGs from selling reimbursement insurance policies to automobile dealers to cover their liability on motor vehicle service contracts. Or. Rev. Stat. S 646.267(5)(b). We must decide whether the LRRA preempts the Oregon Service Contract Act.
 
 
 2
 Plaintiff-appellee National Warranty Insurance Company ("NWIC") filed suit against defendant-appellant Mike Greenfield, Director of the Oregon Department of Consumer and Business Affairs, seeking a declaratory judgment either that the Service Contract Act is preempted by the LRRA, or that, in order to avoid preemption, the phrase "authorized insurer" in the Service Contract Act must be read to include RRGs. NWIC also seeks to enjoin defendant from preventing it from issuing service contract reimbursement insurance policies in Oregon.
 
 
 3
 The parties consented to have the suit heard in the district court by a Magistrate Judge. See Fed. R. Civ. P. 73; 28 U.S.C. S 636(c). The district court granted summary judgment for NWIC. It concluded that the LRRA precludes the state from adopting a financial responsibility requirement that excludes all RRGs from selling reimbursement insurance policies to automobile dealers, and it enjoined the state from treating RRGs differently from "authorized insurers" under the Service Contract Act. Defendant timely appealed, and we have jurisdiction pursuant to 28 U.S.C. S 1291.
 
 
 4
 We review de novo a grant of summary judgment. See Robi v. Reed, 173 F.3d 736, 739 (9th Cir. 1999). We agree with the well-reasoned opinion of the Magistrate Judge, see National Warranty Ins. Co. v. Greenfield (NWIC), 24 F.Supp.2d 1096 (D. Or. 1998), and we hold that the Oregon Service Contract Act is preempted by the LRRA.
 
 
 5
 * In response to escalating product liability insurance premiums in the late 1970s and early 1980s, manufacturers began to bypass conventional insurance companies and to obtain product liability insurance from insurance cooperatives known as RRGs. See Ophthalmic Mut. Ins. Co. v. Musser, 143 F.3d 1062, 1064 (7th Cir. 1998); Garage Serv. & Equip. Dealers Liab. Ass'n of Am., Inc. v. Homes, 867 F.Supp. 1301, 1303 (E.D. Ky. 1994). Congress enacted the PLRRA in 1981 to encourage the formation and growth of RRGs by reducing state regulation of RRGs, see Mears Transp. Group v. State of Florida, 34 F.3d 1013, 1016-17 (11th Cir. 1994), thereby reducing the expenses of RRGs and the cost of insurance to RRG members. Under the PLRRA, an RRG is permitted to provide product liability insurance in all states, free of insurance regulation by those states, if it complies with the insurance laws of the state it chooses as its "chartering jurisdiction."[2] 15 U.S.C. S 3901(4)(C)(i). In the words of the House Report accompanying the PLRRA, the preemption of regulation bynon-chartering states enables "the efficient operation of risk retention groups by eliminating the need for compliance with numerous non-chartering state statutes that, in the aggregate, would thwart the interstate operation [of] . .. risk retention groups." H.R. Rep. No. 190, 97th Cong., 1st Sess. 12 (1981), reprinted in 1981 U.S.C.C.A.N. 1432, 1441.
 
 
 6
 In 1986, Congress enacted the LRRA, amending the PLRRA to allow RRGs, which had previously been limited to product liability insurance, to provide additional kinds of liability insurance. See Ophthalmic, 143 F.3d at 1064. Under the LRRA, an RRG is defined as "any corporation or other limited liability association . . . whose primary activity consists of assuming, and spreading all, or any portion, of the liability exposure of its group members." 15 U.S.C. S 3901(a)(4)(A). The LRRA continues to preempt insurance regulation by nonchartering states, 15 U.S.C. S 3902(a), subject to a newly added exception. In order to "augment[ ] the authority of nonchartering states to regulate solvency, trade practices and other matters," the LRRA allows states to pass financial responsibility laws requiring an enterprise to purchase insurance in order to protect the public against the risk of insolvency of that enterprise. H.R. Rep. No. 99-865, 99th Cong., 2d Sess. (1986), reprinted in 1986 U.S.C.C.A.N. 5303. Under an exception to federal preemption, the LRRA allows a state, as part of such a financial responsibility law, to "include or exclude insurance coverage obtained from . . . a risk retention group." 15 U.S.C. S 3905(d). The meaning of this exception is at the heart of this appeal.
 
 II
 
 7
 * In 1995, Oregon enacted the Service Contract Act, under which an automobile dealer cannot sell a service contract on a motor vehicle unless that dealer is registered with the Department of Consumer and Business Services. Or. Rev. Stat. S 646.267(2). In order to register, a dealer must establish its financial responsibility by proving either that it has a net worth of at least $100 million or that it has a reimbursement policy issued by an "authorized insurer." Or. Rev. Stat. S 646.267(5). To qualify as an "authorized insurer," an insurer must obtain a certificate of authority from the Director of the Oregon Department of Consumer and Business Services, and an insurer may obtain a certificate of authority only if it is a member of the Oregon Insurance Guaranty Association ("OIGA"). Or. Rev. Stat. SS 731.354, 731.066(1), 734.550. The LRRA explicitly exempts RRGs from participation in state insurance guaranty associations such as the OIGA. 15 U.S.C. S 3902(a)(2) ("[An RRG is exempt from any State law, rule, regulation, or order that would] require or permit a risk retention group to participate in any insurance insolvency guaranty association to which an insurer licenced in the State is required to belong.").
 
 
 8
 The district court held, and we agree, that "there is no evidence or implication that the [Oregon] legislature intended the term `authorized insurer' [in the Service Contract Act] to mean anything different than its definition in the Oregon Insurance Code." NWIC, 24 F. Supp.2d at 1102. "[I]n the absence of evidence to the contrary, we may assume that the [Oregon] legislature intends words to be used consistently." State v. Holloway, 138 Or. App. 260, 267, 908 P.2d 324, 328 (1995).[3] Because the LRRA forbids RRGs from participating in the OIGA, because an insurer may not become an "authorized insurer" without participating in the OIGA, and because the Oregon Service Contract Act allows automobile dealers to demonstrate financial responsibility through purchase of insurance only from an "authorized insurer," the Service Contract Act effectively precludes all RRGs from providing insurance coverage for motor vehicle service contracts. See Or. Rev. Stat. S 646.267(5)(b). Though the Service Contract Act does not mention RRGs by name, it thus operates as a categorical exclusion of RRGs. The question before us is whether such an exclusion is permitted under the LRRA.
 
 B
 
 9
 So long as it acts within the scope of its enumerated powers, Congress may preempt inconsistent state law. See Bran-nan v. United States Aid Funds, Inc., 94 F.3d 1260, 1263 (9th Cir. 1996). There is no question in this case whether Congress may preempt Oregon law; the question, rather, is whether Congress has done so. "In determining whether federal law preempts a state statute, we look to congressional intent. Preemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." FMC Corp. v. Holliday, 498 U.S. 52, 56-57 (1990) (internal quotations omitted). A federal statute may preempt state law by express statement, by occupying a field, or by conflicting with state law. Industrial Truck Ass'n, Inc. v. Henry, 125 F.3d 1305, 1309 (9th Cir. 1997).
 
 
 10
 There are two presumptions underlying any preemption analysis. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996). First, the states are independent sovereigns in our federal system, and preemption will not be easily found. "In all preemption cases, and particularly in those in which Congress has `legislated . . . in a field which the States have traditionally occupied,' we `start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). Second, the "analysis of the scope of the statute's preemption is guided by [the ] oft-repeated comment . . . that the purpose of Congress is the ultimate touchstone in every preemption case." Id. (quotations omit-ted).
 
 C
 
 11
 * Even with a general presumption that insurance law should ordinarily be regulated under state law, as reinforced by the McCarran-Ferguson Act,[4] the language and purpose of the LRRA clearly indicate an intent to preempt state laws regulating RRGs. See 15 U.S.C. SS 3902(a), 3905(d). The relevant language of the LRRA provides:
 
 
 12
 (a) Except as provided in this section, a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would--
 
 
 13
 (1) make unlawful, or regulate, directly or indirectly, the operation of a risk retention group . . . [or]
 
 
 14
 . . . .
 
 
 15
 (4) otherwise discriminate against a risk retention group or any of its members, except that nothing in this section shall be construed to affect the applicability of State laws generally applicable to persons or corporations.
 
 
 16
 15 U.S.C. S 3902(a) (emphasis added). The preemption specified in S 3902(a) applies "to [state ] laws governing the insurance business pertaining to . . . liability insurance coverage provided by a risk retention group." 15 U.S.C.S 3902(b).
 
 
 17
 Although S 3902(a) plainly preempts most regulation of RRGs by non-chartering states, S 3905(d) preserves, at least to some extent, the traditional state regulatory role by allowing states to require proof of financial responsibility as a condition for conducting certain activities, and, in so doing, to "include or exclude . . . a risk retention group " as an eligible insurer. That section provides:
 
 
 18
 Subject to the provisions of section 3902(a)(4) of this title relating to discrimination, nothing in this chapter shall be construed to preempt the authority of a State to specify acceptable means of demonstrating financial responsibility where the State has required a demonstration of financial responsibility as a condition for obtaining a license or permit to undertake specified activities. Such means may include or exclude insurance coverage obtained from an admit ted insurance company, an excess lines company, a risk retention group, or any other source regardless of whether coverage is obtained directly from an insurance company or through a broker, agent, purchasing group, or any other person.
 
 
 19
 15 U.S.C. S 3905(d) (emphasis added).
 
 
 20
 The state conceded in the district court that the insurance at issue is liability insurance within the meaning of the LRRA, 15 U.S.C. S 3902(b), and that the LRRA applies to Oregon's Service Contract Act. Applying the LRRA, we hold that the Service Contract Act is a statute "specify[ing] acceptable means of demonstrating financial responsibility. . . as a condition for obtaining a license or permit to undertake specified activities" within the meaning of S 3905(d). Section 3905(d) permits a state to specify financial responsibility requirements by "means" that "exclude . . . a risk retention group," subject to the qualification that such exclusion may not be "discrimination" within the meaning ofS 3902(a)(4). We first analyze S 3905(d), then S 3902(a)(4).
 
 2
 
 21
 Section 3905(d) specifically allows a state to exclude insurance coverage obtained from an RRG as an acceptable means of demonstrating financial responsibility by an insured. The question before us is whether the right of a state to "exclude insurance coverage obtained from . . . a risk retention group" under this section is the right to exclude coverage from particular RRGs or whether it is the right to exclude coverage from all RRGs. The text is not fully determinative, but, for two reasons, we believe that its most natural reading permits the state to exclude coverage only from particular RRGs.
 
 
 22
 First, the use of the singular risk retention "group," rather than the plural risk retention "groups, " suggests that the state is given the right to exclude coverage from particular RRGs, on grounds specific to those RRGs, rather than to exclude coverage from all RRGs. If S 3905(d) had intended to authorize the state to exclude coverage from all RRGs, a more conventional way to express that meaning would have been to provide that "such means may . . . exclude insurance coverage obtained from . . . risk retention groups."
 
 
 23
 Second, the text specifies that a state has authority to include or exclude coverage from "an admitted insurance company, an excess lines company, a risk retention group, or any other source." If we take the meaning of the reference to "a risk retention group" from the context in which it is used -that is, from the likely meaning of the references to the other insurance companies in the same list -the language suggests that the statute is intended to allow exclusion only of particular RRGs. It is very unlikely that the section's reference to "an admitted insurance company" contemplates the exclusion of coverage from all admitted insurance companies, for such companies are, in Oregon's terminology,"authorized insurers"; that is, admitted insurance companies are the insurance companies that a state has authorized to provide insurance coverage within the state. Rather, the reference almost certainly contemplates the exclusion of particular "admitted insurance companies" on grounds specific to those companies. If the reference to "a risk retention group " is to have a comparable meaning, the reference similarly contemplates exclusion of particular RRGs on grounds specific to those RRGs.
 
 
 24
 The Eleventh Circuit rejected this reading of S 3905(d) because it "would render superfluous several provisions of the [LRRA] that are specifically aimed at preserving state authority to exclude financially impaired risk retention groups." Mears, 34 F.3d at 1019; see also Ophthalmic , 143 F.3d at 1070. We disagree. The provisions to which the Mears court refers are SS 3902(e) and 3906. Section 3902(e) provides:
 
 
 25
 Nothing in the section shall be construed to affect the authority of any Federal or State court to enjoin . . . .
 
 
 26
 (2) the solicitation or sale of insurance by, or operation of, a risk retention group that is in hazardous financial condition or is financially impaired.
 
 15 U.S.C. S 3902(e). Section 3906 provides:
 
 27
 Any district court of the United States may issue an order enjoining a risk retention group from soliciting or selling insurance, or operating, in any State (or in all States) . . . upon a finding of such court that such group is in hazardous financial condition.
 
 
 28
 15 U.S.C. S 3906.
 
 
 29
 A construction that reads S 3905(d) as referring to particular RRGs rather than to all RRGs does not render these provisions superfluous. On the contrary, such a construction helps to give them meaning. The most likely ground for excluding insurance coverage from a particular RRG under S 3905(d) is the financial condition of that RRG. That is, a financial responsibility law could reasonably require that insurance providers meet minimum financial criteria, which could cause coverage from some RRGs (and indeed from some authorized insurance companies) to be excluded. Sections 3902(e) and 3906 explicitly give to the federal and state courts (under S 3902(e)) and the federal courts (under S 3906) the power to implement such an exclusion by issuing an injunction preventing a particular RRG that is "financially impaired" or is in "hazardous financial condition" from offering insurance coverage.
 
 
 30
 Section 3905(d) allows a state to exclude coverage from an RRG "[s]ubject to the provisions of section 3902(a)(4) . . . relating to discrimination." Section 3902(a)(4) provides that an RRG is exempt from any state "law, rule, regulation, or order" (hereinafter "law") that would "otherwise discriminate against a risk retention group." Thus, in order to interpret S 3905(d), we must determine the meaning of the phrase "otherwise discriminate" in S 3902(a)(4).
 
 3
 
 31
 Section 3902(a) has four subsections.[5] Section 3902(a)(1) exempts RRGs from any state law that would regulate or make unlawful an RRG, except that a state may require an RRG to (A) comply with the state's "unfair claim settlement practices"; (B) "pay, on a nondiscriminatory basis, applicable premiums and taxes and other taxes" on insurers; (C) "participate, on a nondiscriminatory basis, in any mechanism " for the "equitable apportionment" of liability insurance losses and expenses among insurers; (D) designate the state insurance commissioner as an agent for service of process; (E) under certain circumstances, submit to examination by the state insurance commissioner to determine the RRG's financial condition; (F) comply with lawful orders concerning financial impairment or dissolution; (G) comply with state law regarding "deceptive, false, or fraudulent acts or practices"; (H) comply with an injunction issued by a court of competentjurisdiction upon petition by the state insurance commissioner alleging that the RRG is in a "hazardous financial condition"; and (I) provide a prescribed notice, accompanying any RRG insurance policy, stating that RRGs are not subject to all state laws governing insurance and do not participate in state insolvency guaranty funds. Section 3902(a)(2) exempts an RRG from any state law that would require or permit an RRG to participate in a state insolvency guaranty association. Section 3902(a)(3) exempts an RRG from any state law that would require a policy issued by an RRG to be countersigned by an insurance broker or agent within the state. Finally, S 3902(a)(4) exempts an RRG from any state law that would
 
 
 32
 otherwise discriminate against a risk retention group or any of its members, except that nothing in this section shall be construed to affect the applicability of State laws generally applicable to persons or corporations.
 
 
 33
 (emphasis added).
 
 
 34
 In its most neutral form, to "discriminate" means simply to differentiate, but particularly as used in legal contexts, to discriminate ordinarily means to differentiate in an undesirable or illegal way. But even when used to refer to undesirable or illegal differentiation, the meaning of the term is varied and unsettled. As Justice White has written, the word discrimination is "inherently" ambiguous. Guardians Assoc. v. Civil Serv. Comm'n, 463 U.S. 582, 592 (1983). Not surprisingly, the meaning of "discriminate," as used in S 3902(a)(4), is not altogether clear. The Second Circuit recently pointed out the difficulty in interpreting "discrimination" as it is used in this section, saying, among other things, "that it is unclear whether the LRRA forbids only intended targeting of RRGs, or whether it also prohibits legislation with an unintended disparate impact." Preferred Physicians Mut. Risk Retention Group v. Pataki, 85 F.3d 913, 917-918 (2d Cir. 1996). The Second Circuit found it unnecessary to resolve the difficulty, but we cannot avoid the issue.
 
 
 35
 Fortunately, we are not entirely without interpretive tools. We note that S 3902(a)(4) does not exempt any state law that would "discriminate," but, rather, any state law that would "otherwise discriminate" (emphasis added). The use of the word "otherwise" suggests that some of the state laws previously described in S 3902(a) "discriminate " against RRGs. But few of the state laws referred to in subsections S 3902(a)(1)-(3) are discriminatory in the sense of differentiating between RRGs and other insurance companies generally or admitted insurance companies in particular. None of the state laws permitted under S 3902(a)(1) appears to be discriminatory in this sense; indeed, some are explicitly required to be "on a nondiscriminatory basis." Nor does a state law prohibited under S 3902(a)(2) appear to be discriminatory in the sense of treating RRGs adversely. Finally, a state law prohibited under S 3902(a)(3) does not appear to be discriminatory in the sense of differentiating, for such a law would only impose on an RRG a requirement that an in-state insurance agent or broker sign an insurance policy, as a state would typically require for a policy issued by an admitted insurance company.
 
 
 36
 The common characteristic of almost all of the state laws described in S 3902(a)(1)-(3) -both those that are permitted and those that are prohibited -is that they specifically regulate insurance companies. If the word "otherwise " is not meaningless, the import of S 3902(a)(4) may be that any state law specifically regulating insurance, when applied to an RRG, "discriminates" within the meaning ofS 3902(a). If so, a law regulating insurance is only permitted to apply to an RRG to the extent that S 3902(a), or some other section of the LRRA, explicitly permits it. Although this would not be a conventional use of the term "discriminate," Congress could have meant that regulation of RRGs under a state's insurance laws is inherently discriminatory in that RRGs, unlike admitted insurance companies, are already regulated pursuant to the LRRA, and that to impose further state-based regulation would be to regulate RRGs doubly and thereby to discriminate against them. This interpretation is supported, at least weakly, by the concluding clause of S 3902(a)(4) that specifically allows regulation by state laws not specifically regulating insurance -that is, by state laws "generally applicable to persons and corporations."
 
 
 37
 It is also possible, perhaps even likely, that the inclusion of the word "otherwise" was not carefully considered. In that event, we should read S 3902(a)(4) as employing a meaning for "discriminate" that is closer to its normal usage, signifying undesirable or unlawful differentiation. Discrimination, in this sense, is differentiation without an acceptable justification. If this is the meaning of discrimination in S 3902(a)(4), we should ask what qualifies as an acceptable justification under the LRRA.
 
 
 38
 The answer is largely provided byS 3902(a) itself. The only state regulation of RRGs explicitly permitted under the LRRA is that which is plainly justified by a state's desire to protect those who would benefit from the purchase of insurance. Thus, for example, S 3902(a)(1) permits state laws requiring an RRG to engage in fair settlement practices, to designate an agent for the service of process, to submit to examinations necessary to insure financial soundness, to avoid false and misleading advertisements, and the like. Under this interpretation, the state must show that a law differentiating between an RRG and an admitted insurance company -or between all RRGs and all admitted insurance companies -is justified by the desire to provide such protection.
 
 
 39
 If we assume that discrimination under S 3902(a)(4) means differentiation without an acceptable justification, we must also ask a further question. Is such differentiation underS 3902(a)(4) restricted to state laws that are facially or intentionally differentiating, or does it include state laws that merely have the effect of differentiating? This is, of course, a familiar question in other areas of law, to which different answers are given under different statutes or constitutional provisions, depending on their purposes. See e.g., Title VII of the Civil Rights Act of 1964, 42 U.S.C. S 2000e et seq.; Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988); Washington v. Davis, 426 U.S. 229 (1976). We are given little guidance on how to construe S 3902(a)(4), but it seems to us most likely that Congress did not intend to forbid only facial or intentional discrimination by state laws. The LRRA is a statute with a purely economic purpose, and we believe it most likely that Congress had in mind the economic effect of state laws rather than any specific intent that might lie behind them. See generally U.S. Const. Art. 1,S 8, cl. 3 (Commerce Clause); Oregon Waste Sys., Inc., v. Department of Envtl. Quality, 511 U.S. 93, 99 (1994) (" `discrimination' simply means differential treatment").
 
 4
 
 40
 Based on the foregoing, we conclude that the most reasonable reading of SS 3905(d) and 3902(a)(4) is that the State of Oregon may not exclude insurance coverage from all RRGs under S 3905(d). It may exclude coverage from a particular RRG if it can show that the particular RRG is financially unsound or is otherwise dangerous to those who rely on insurance purchased pursuant to the Oregon Service Contract Act, but it may not categorically exclude coverage from all RRGs.
 
 
 41
 We recognize that a possible interpretation of SS 3905(d) and 3902(a)(4) is that Oregon can exclude coverage from all RRGs if, as a justification for such a categorical exclusion, Oregon can show that RRGs, as a group, are financially unsound or otherwise dangerous. The argument in support of this interpretation would be that such a showing would be a proper justification for state-law exclusion of coverage from RRGs, and that the differentiation between RRGs and admitted insurance companies would therefore not be discrimination within the meaning of S 3902(a)(4). While we cannot dismiss such an argument out of hand, we believe that this reading of the LRRA is inconsistent with the underlying purpose of the statute. We believe that in passing the LRRA, Congress decided that RRGs, as a group, were sufficiently trustworthy providers of insurance that they should be allowed to provide insurance free of state regulation, subject only to specifically granted and fairly narrow exceptions.
 
 III
 
 42
 This is a close case, and we know that, in deciding it as we do, we disagree with the Seventh and Eleventh Circuits. See Ophthalmic, 143 F.3d 1062 (7th Cir. 1998); Mears, 34 F.3d 1013 (11th Cir. 1994). However, we believe that our interpretation of SS 3905(d) and 3902(a)(4) is the most natural reading of the text itself and, further, that this interpretation best accords with the policy of the LRRA in striking a balance between the desire to permit RRGs to operate freely and the legitimate need of states to regulate RRGs.
 
 
 43
 We therefore AFFIRM the decision of the district court.
 
 
 
 Notes:
 
 
 [1]
 Honorable Nora Manella, United States District Judge for the Central District of California, sitting by designation.
 
 
 [2]
 In 1984, NWIC certified to the Commonwealth of Pennsylvania that it satisfied Pennsylvania's capital requirements for a mono-line property and casualty insurer domiciled in Pennsylvania. NWIC has filed a registration statement with Oregon and is a duly qualified RRG within the meaning of the LRRA.
 
 
 [3]
 At oral argument in this court, the state claimed that an RRG domiciled in Oregon would not be required to contribute to the OIGA but would nevertheless be considered an authorized insurer. We do not consider this claim to be "evidence" of a contrary meaning for the term "authorized insurer." Indeed, the state had written precisely the opposite in its brief to this court, claiming that it is "undisputed" that an RRG is not an "authorized insurer." According to the state's brief,"An authorized insurer is an insurer that has a Certificate of Authority to transact business in Oregon. RRGs do not have and cannot obtain such Certificates of Authority."
 
 
 [4]
 "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of [insurance] by the several States." 15 U.S.C. S 1011.
 
 
 [5]
 The full text of S 3902(a) is as follows: Except as provided in this section, a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would --
 (1) make unlawful, or regulate, directly or indirectly, the operation of a risk retention group except that the jurisdiction in which it is chartered may regulate the formation and operation of such a group and any State may require such a group to --
 (A) comply with the unfair claim settlement practices law of the State;
 (B) pay, on a nondiscriminatory basis, applicable premium and other taxes which are levied on admitted insurers and surplus line insurers, brokers, or policyholders under the laws of the State;
 (C) participate, on a nondiscriminatory basis, in any mechanism established or authorized under the law of the State for the equitable apportionment among insurers of liability insurance losses and expenses incurred on policies written through such mechanism;
 (D) register with and designate the State insurance commissioner as its agent solely for the purpose of receiving service of legal documents or process;
 (E) submit to an examination by the State insurance commissioners in any State in which the group is doing business to determine the group's financial condition, if --
 (i) the commissioner of the jurisdiction in which the group is chartered has not begun or has refused to initiate an examination of the group; and
 (ii) any such examination shall be coordinated to avoid unjustified duplication and unjustified repetition;
 (F) comply with a lawful order issued --
 (i) in a delinquency proceeding commenced by the State insurance commissioner if there has been a finding of financial impairment under subparagraph (E); or
 (ii) in a voluntary dissolution proceeding;
 (G) comply with any State law regarding deceptive, false, or fraudulent acts or practices, except that if the State seeks an injunction regarding the conduct described in this subparagraph, such injunction must be obtained from a court of competent jurisdiction;
 (H) comply with an injunction issued by a court of competent jurisdiction, upon a petition by the State insurance commissioner alleging that the group is in hazardous financial condition or is financially impaired; and
 (I) provide the following notice, in 10-point type, in any insurance policy issued by such group: "NOTICE This policy is issued by your risk retention group. Your risk retention group may not be subject to all of the insurance laws and regulations of your state. State insurance insolvency guaranty funds are not available for your risk retention group."
 (2) require or permit a risk retention group to participate in any insurance insolvency guaranty association to which an insurer licensed in the State is required to belong;
 (3) require any insurance policy issued to a risk retention group or any member of the group be countersigned by an insurance agent or broker residing in that State; or
 (4) otherwise discriminate against a risk retention group or any of its members, except that nothing in this section shall be construed to affect the applicability of State laws generally applicable to persons or corporations.